IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | CRIMINAL DOCKET NO.: 16-cr-88 |
| : | |
| MOHAMMED JABATEH : | |

_____

**DEFENDANT MOHAMMED JABATEH'S SENTENCING MEMORANDUM**

The defendant, Mohammed Jabateh was found guilty by a jury before Your Honor on October 18, 2017 of Counts 1 and 2, 18 U.S.C. §1546(a), Fraud in Immigration and Counts 3 and 4, 18 U.S.C. § 1621(1), Perjury. The adjusted offense level under the United States Sentencing Guidelines is a fourteen (14) and the sentencing range is fifteen (15) to twenty-one (21) months under the 2010 edition of the Sentencing Guidelines, which apply in this case due to the offenses occurring prior to the 2016 changes to the United States Sentencing Guidelines. It is requested that this Court impose a fair and reasonable sentence considering the United Sentencing Guidelines and other applicable law, the facts and circumstances of the offense and Mr. Jabateh's personal background and history.

**I.　SENTENCING FACTORS UNDER TITLE 18 SECTION 3553(a)**

A. 3553(a)(1) THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT

　　a.　Nature and Circumstances of the Offense:

On December 7, 1998, Mr. Jabateh, a Liberian citizen, applied for asylum by filing a Form I-589 with the United States immigration authorities. In his application, Mr. Jabateh checked the "Yes" box for the following two questions:

1

*1. Have you or any member of your family ever belonged to or been associated with any organizations or groups in your home country, such as, but not limited to, a political party, student group, labor union, religious organization, military or paramilitary group, civil patrol, guerrilla organization, ethnic group, human rights group, or the press or media?*

*2. If yes, provide a detailed explanation of your or your relatives' involvement with each group and include the name of each organization or group; the dates of membership or affiliation; the purpose of the organization; your duties or your relatives' duties or responsibility in the group or organization; and whether you or your relatives are still active in the group(s)?*

In response to the above questions, Mr. Jabateh provided a six page personal statement. The statement included details about his childhood and when he came to the United States. It is also stated that Mr. Jabateh was an employee of the Special Security Service ("SSS") team for the Executive Mansion in 1992. Further, he stated that in 1995 when a new government took over he was assigned as part of the security team detail for Alhaji Kromah, a leader of the United Liberation Movement for Democracy in Liberia ("ULIMO"). During the interview, Mr. Jabateh revealed his involvement in Liberia's civil war by providing his ULIMO identification cards reflecting that he was a commander.

On January 11, 1999, Asylum Officer Nancy Vanlue interviewed Mr. Jabateh for the purpose of determining if his application for asylum should be granted. Mr. Jabateh falsely responded "no" to the following three questions: (1) "Have you ever committed a crime?"; (2) Have you ever harmed anyone else?"; and (3) "Have you ever been forced to harm someone else?" During this interview, he told Vanlue that he had been referred to in several newspaper articles as "Jungle Jabbah" or "Jungle Jabbateh." Mr. Jabateh was granted asylum on December 23, 1999.

On April 12, 2002, Mr. Jabateh applied for legal permanent residency by filing a Form I-485. During the application process Mr. Jabateh responded "No" to the following two questions:

*1. Form I-485. Part 3, Question 8: Have you ever engaged in genocide, or otherwise ordered, incited, assisted or otherwise participated in the killing of any person because of race, religion, nationality, ethnic origin or political opinion?*

*2. Form I-485, Part 3, Question 10: Are you under a final order of civil penalty for violating 274C of the Immigration and Nationality Act for use of fraudulent documents or have you, by fraud or willful misrepresentation of a material fact, ever sought to procure, procured, or procured, a visa, other documentation, or entity into the U.S. or any immigration benefit?*

U.S. Citizenship and Immigration Services ("USCIS") Immigration Officer Norman M. de Moose interviewed Mr. Jabateh under oath on March 11, 2011 in order to determine whether or not he should be granted legal permanent residency. During the interview Mr. Jabateh swore that his answers were truthful, however the answers were false.

During the trial a multitude of witnesses testified as to Mr. Jabateh's involvement in Liberia's civil war during the early 1990's. James Fasuekoi, a Liberian photojournalist testified that he was assigned on a daily basis to the Executive Mansion where Liberia's interim government was in power. Fasuekoi testified that he photographed Mr. Jabateh in Liberia during the civil war. The photograph showed Mr. Jabateh had short dreadlocks, was wearing sunglasses, fatigues and carrying a weapon. Fasuekoi further testified from his experience working at the Executive Mansion he knew that the Special Security Service "SSS" officers were neatly groomed and did not dress like Mr. Jabateh. Further, Fasuekoi testified that in contrast to Mr. Jabateh's statement, he never saw Mr. Jabateh working at the Executive Mansion in any capacity. Witness Gregory Stemn, another Liberian photojournalist who worked with Fasuekoi

also testified to the fact that he did not see Mr. Jabateh working at the Executive Mansion from 1991 through 1995.

A total of eighteen (18) civilian witnesses testified during the trial as to their interactions with Mr. Jabateh during Liberia's civil war in the early 1990's. These witnesses testified that they witnessed Mr. Jabateh murder, rape, enslave and torture those opposed to the ULIMO faction. In addition to these witnesses, three witnesses who worked on behalf of the United States government, specifically within the asylum and immigration departments testified as to their interactions with Mr. Jabateh during the immigration process. As indicated above, Mr. Jabateh's convictions relate directly to his answers provided during the asylum and immigration process.

      b.   <u>History and Characteristics of the Defendant:</u>

Mr. Jabateh is the youngest of four children and was raised in Bong County, Liberia. He was raised in a home that had no running water or utilities and had a dirt floor. Water was transported by buckets and oil lanterns were used for light. His mother, who is now deceased, worked redistributing products such as livestock, rice and produce. His father, who is also deceased, supervised production of gold and diamond mine camps in Liberia. Mr. Jabateh would occasionally visit his father and stay with him while at camp, but following his mother's death he was raised primarily by his aunt. His father had multiple wives and at least ten (10) additional children. Mr. Jabateh has not seen many of his siblings in years, however he maintains regular telephone contact with them. His brother Lieu Jabateh was killed during Liberia's civil war in the early 1990's.

Mr. Jabateh's family belonged to the Mandingo tribe. In the early 1990's his family, who were President Doe supporters fled Liberia for Sierra Leone due to attacks by rebels. His aunt,

who primarily raised him and his brother were killed by rebels during the attack. While in Sierra Leone the family stayed at a United Nations refugee camp and subsequently rented a house in a small village. When the war reached Sierra Leone, he began working as a translator for the Liberian United Defense Force (LUDF). LUDF sought to protect Liberians from the rebels. LUDF later became the United Liberation Movement for Democracy in Liberia (ULIMO), which was successful in driving the rebels out of Sierra Leone, which in turn allowed Mr. Jabateh and his family to return to Liberia. ULIMO eventually split into different factions, ULIMO-K and ULIMO-J. Mr. Jabateh became a commander in ULIMO-K. Upon returning to Liberia, Mr. Jabateh served as "commander" of security forces, which protected Liberia's interim government. Once Charles Taylor was elected in 1997 he was dismissed from his security detail and tortured as a result of his prior political affiliations. Subsequently, he secured passage to Guinea, however he was interrogated and threatened by authorities during his eleven (11) month stay in the country.

    In 1998 Mr. Jabateh entered the United States after being forced out of Liberia. He moved to Philadelphia shortly after entering the United States and remained in the Philadelphia area until his arrest in 2016. Mr. Jabateh is the father of thirteen (13) children. Mr. Jabateh has eight (8) children, who live in Liberia. Mr. Jabateh maintains consistent communication with his children in Liberia and has always provided them with financial support. He also has four (4) children between the ages of seven (7) and twenty (20) years old, who live in the United States. He has financially supported the children and their mother by paying her mortgage and children's monthly living expenses. His youngest child, Mammna Jabateh, was born in 2016 in the United States from a relationship with Nafisa Saeed. Mr. Jabateh lived with Ms. Saeed and their daughter in Lansdowne, Pennsylvania, a home he owns, until his arrest. Mr. Jabateh also

has a strong, father-like bond with Ms. Saeed's ten (10) year old daughter from a previous relationship.

While in the United States, Mr. Jabateh started his own business, Jabateh Brother Loading Service. The company packs bulk items and ships them from the United States to Liberia. Since his incarceration a friend has taken over the business, however Mr. Jabateh is still the owner. Mr. Jabateh is known by friends and colleagues as an extremely hard worker, who often worked seven (7) days a week and would even sleep on the business's property in order to prevent theft. Friends of Mr. Jabateh describe him as very religious, "generous," "peaceful" and a "diligent" worker. (See PSR p.27-28).

B. 3553 (a)(2) THE NEED FOR THE SENTENCE IMPOSED TO REFLECT THE SERIOUSNESS OF THE OFFENSE, TO PROMOTE RESPECT FOR THE LAW, AND TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE

The conduct of Mr. Jabateh should be punished to promote respect for the law and to provide *just* punishment. The Guidelines in this case provide for such punishment. Although, many of the civilian witnesses testified as to serious human rights offenses, it should be noted that the crimes for which Mr. Jabateh has been convicted of relate directly to his dishonesty during the immigration process, not the alleged human rights offenses. As noted below the only conclusion we can draw from the jury's verdict is that Mr. Jabateh was dishonest when answering questions under oath while seeking asylum and permanent residency. The jury's verdict does not reveal what lie or lies account for the underlying conduct. A guideline sentence will reflect the seriousness of lying on immigration forms.

C. 3553 (a)(3) THE NEED TO AFFORD ADEQUATE DETERRENCE TO CRIMINAL CONDUCT, AND TO PROTECT THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT

A guideline sentence will deter others from committing crimes such as those committed by Mr. Jabateh. However, in this case there is significant collateral punishment that stems from the conviction. The deterrence factor is significantly served by the fact that Mr. Jabateh will be deported from the United States. Mr. Jabateh will leave behind his children, his business, his home and his wife. Mr. Jabateh will never return to the life he worked so hard to build for the past eighteen (18) years in the United States. Such loses are not considered by the Guidelines, but the Court is permitted to consider them under Section 3553(a).

Mr. Jabateh poses little risk of recidivism. He is 50 years old and does not possess the traits and characteristics of those prone to reoffend. His religious, work and family history, lack of criminal history and the type of crime committed, all overwhelmingly suggest that there is little or no risk of recidivism. He has lived a law abiding life during his time in the United States.

D. 3553(a)(4) THE NEED TO PROVIDE THE DEFENDANT WITH EDUCATIONAL OR VOCATIONAL TRAINING, MEDICAL CARE, OR OTHER CORRECTIONAL TREATMENT IN THE MOST EFFECTIVE MANNER

Mr. Jabateh is in need of educational training, but he nevertheless possesses skills and characteristics which demonstrate that he is very capable of being a productive member of society. After arriving in this country, he worked steadily and soon became self employed after founding his own business; Jabateh's Brother's Loading Company since 2008. He completed GED classes and intends to take the GED test. Mr. Jabateh also has his commercial driver's license (CDL). The need for vocational training is minimal.

E. 3553(a)(5) THE GUIDELINES AND POLICY STATEMENTS ISSUED BY THE SENTENCING COMMISSION

The Court will obviously consider the guidelines and policy statements of the sentencing commission at the time of sentencing.

F. 3553(a)(6) THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES AMONG DEFENDANTS WITH SIMILAR RECORDS WHO HAVE BEEN FOUND GUILTY OF SIMILAR CONDUCT

A Guideline sentence would avoid unwarranted disparity among defendants in related cases. Such a sentence is appropriate in Mr. Jabateh's case considering his background, criminal history, nature of the offense and collateral punishment. Logic, reason, fairness and the proposed first time offender guideline, all strongly suggest that the defendant's characteristics and background would warrant a guideline sentence.

G. 3553(a)(7) THE NEED TO PROVIDE RESTITUTION TO ANY VICTIMS OF THE OFFENSE

Restitution is not applicable in this case.

II. A GUIDELINE SENTENCE IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO ACHIEVE THE PURPOSES OF SENTENCING

In each case it must first be determined what version of the United States Sentencing Guidelines apply. In cases where the criminal conduct occurred during or after the year 2016, the 2016 edition of the United States Sentencing Guidelines shall be used. In cases where the criminal conduct occurred prior to 2016, the 2010 edition of the United States Sentencing Guidelines shall apply. In the present case, Mr. Jabateh's criminal conduct occurred prior to 2010. Thus, the 2010 edition of the Sentencing Guidelines shall apply in this case.

According to USSG §5K2.0, the Court may depart from the applicable guidelines range if there exists aggravating or mitigating circumstances not adequately taking into consideration by

the Sentencing Guidelines. Under the 2016 Sentencing Guidelines (which do not apply in this case), USSG §2L2.2, Application Note 4, "serious human rights offense" means (A) violations of federal criminal laws relating to genocide, torture, war crimes, and the use of recruitment of child soldiers; and (B) conduct that would have been a violation of any such law if the offense had occurred within the jurisdiction of the United States or if the defendant or the victim had been a national of the United States. Under USSG §2L2.2, Mr. Jabateh's total offense level would be a 25, and his guidelines range for imprisonment would be fifty seven (57) months to seventy one (71) months. The U.S. Probation Department states that multiple witnesses testified about war crimes committed by Mr. Jabateh, which he lied about when applying for asylum and residency in the United States. Further, the U.S. Probation Department states that the war crimes included numerous examples of serious human rights offense involving murder, rape, significant physical and psychological injury, theft, and other acts of heinous, cruel and brutal extreme conduct. Mr. Jabateh was indeed found guilty of Counts 1 and 2, 18 U.S.C. §1546(a), Fraud in Immigration and Counts 3 and 4, 18 U.S.C. § 1621(1), Perjury, however it is impossible to ascertain based on the jury's verdict what underlying conduct was the basis for their verdict. Ignoring the fact that the 2016 edition of the Sentencing Guidelines do not apply in this case, any enhancement based on serious human rights offense should also not apply due to the fact that the jury could have found Mr. Jabateh guilty of the offenses based on conduct that did not include any serious human rights violations, such as being dishonest about his work in the "SSS" or his role as a civil war combatant. The verdict does not compel the conclusion that the jury believed every single witness' account of Mr. Jabateh's acts in violation of human rights of civilians and non-combatants in Liberia's civil war. Since there is no way to know what underlying conduct the jury based their verdict on, it would be a mere guess to conclude that it was based on even

one serious human rights offense. A guilty verdict in this case does not necessarily require a finding that Mr. Jabateh engaged in conduct constituting human rights violations. Therefore, the enhancement should not apply because it is not taken into consideration under the 2010 edition of the United States Sentencing Guidelines and it is impossible to make a direct correlation between the jury's verdict and any serious human rights offenses.

## V. CONCLUSION

It is requested that the Court especially consider the Defendant's past history, his present family circumstances and his collateral punishment. It is respectfully requested that this Court impose a guideline sentence in this case for all of the reasons stated herein.

Respectfully Submitted,

_____/s/,_____

Gregory J. Pagano, Esquire
Attorney for Mohammed Jabateh

Date: January 31, 2018