**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 16-cr-88** |
| **MOHAMMED JABBATEH**<br>a/k/a "Jungle Jabbah" | : | |

### GOVERNMENT'S AMENDED MOTION FOR UPWARD DEPARTURE AND/OR VARIANCE AND AMENDED SENTENCING MEMORANDUM

The United States of America, by its attorneys, Louis D. Lappen, United States Attorney for the Eastern District of Pennsylvania, and Linwood C. Wright, Jr. and Nelson S.T. Thayer, Jr., Assistant United States Attorneys for the District, respectfully submits, pursuant to the Court's February 6, 2018 Order (ECF Doc. No. 121), the following amended memorandum in support of its motion for upward sentencing departure and/or variance and amended sentencing memorandum.

### I.  INTRODUCTION

From 1992 through 1995, during the height of Liberia's first civil war, defendant Mohammed Jabbateh, while serving as the commander of the Zebra Battalion of the warring faction known as the United Liberation Movement of Liberia for Democracy ("ULIMO"), personally and unremittingly committed acts of nearly unfathomable brutality.  The evidence at trial established that the defendant participated in and ordered rapes, sexual enslavement, slave labor, murder, mutilation and ritual cannibalism, and utilized child soldiers throughout.  Upon reaching the United States in 1998, the defendant applied for asylum and later for adjustment of his status to lawful permanent resident, repeatedly lying and ultimately perjuring himself during the immigration process to conceal his heinous wartime conduct.  In doing so, he thwarted the United States' crucial gatekeeping process designed to provide refuge to bona fide victims of

persecution, manipulating that process so that he -- a persecutor -- could find safe haven in this country for nearly two decades.  Even among human rights violators who have been prosecuted in U.S. courts for immigration fraud -- to say nothing of the garden variety immigration fraud offenders -- the defendant is an extraordinary outlier in the scope and intensity of his personal savagery and the concomitant corruption of the very system that was designed to prevent the likes of the defendant from setting foot on our shores, much less being granted asylum and living freely for almost twenty years.  This case therefore falls far outside the heartland of typical immigration fraud cases contemplated by the U.S. Sentencing Guidelines.  Accordingly, the government moves for an upward departure pursuant to U.S.S.G. §§ 5K2.0 and 4A1.3(a)(1).  In addition, the government moves for an upward variance based upon the sentencing factors in 18 U.S.C. § 3553(a).  Given that the shocking atrocities committed by the defendant formed the basis for his false statements and perjury, his case is extraordinary and warrants sentencing him to the statutory maximum per count of conviction, to run consecutively, for a total sentence of thirty years' imprisonment.

The Third Circuit has set forth a three-step process which the district courts must follow in compliance with the Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220 (2005):

(1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*.

(2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force.

(3) Finally, they are to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines.

*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006) (quotation marks, brackets, and citations omitted) (citing *United States v. King*, 454 F.3d 187, 194, 196 (3d Cir. 2006)).

At the third step of the sentencing process, the Court must consider the advisory guideline range along with all the pertinent considerations of sentencing outlined in 18 U.S.C. § 3553(a) in determining the final sentence.  "The record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it."  *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted).

## II.    BACKGROUND

On March 10, 2016, a federal grand jury sitting in the Eastern District of Pennsylvania returned an indictment charging the defendant with two counts of fraud in immigration documents, in violation of 18 U.S.C. § 1546(a), and two counts of perjury, in violation of 18 U.S.C. § 1621.  On October 18, 2017, after a two-week trial, the defendant **was found guilty of all four counts**.

## III.    THE OFFENSE CONDUCT

The evidence at trial established that the defendant was the commander of ULIMO's Zebra Battalion, and that as such, he and his fighters swept throughout western Liberia from 1992 through 1994.  The defendant and the fighters under his command followed a grim *modus operandi* that became all too familiar to the defenseless civilians who found themselves constantly buffeted between the various warring factions:  whether entering a village or encountering its inhabitants in the bush, the defendant and his fighters would capture, strip, beat,

3

tie up in the infamous "duckfa tabed" fashion, loot, rob, rape and murder the civilians.  Men would be forced into slave labor in the diamond and gold mines under the defendant's control, and the women would be forced to work and become sex slaves for him and his fighters, all under the armed guard of the defendant's fighters, including child soldiers.

The defendant exercised his authority absolutely and with impunity, summarily deciding the fate of POW and civilian alike.  The defendant was the only law in a lawless war-torn land, and his word, spoken without mercy even in the face of his victims' suffering and terrified pleading before his very eyes, sealed their fates.  The jury heard the names of many of the defendant's victims, but so many more will remain anonymous, their bodies left to rot in the bush once his orders were carried out, or, if they survived, to endure the lasting trauma exclusively suffered by the victims of such atrocities.

Summarized below by general category is a non-exhaustive accounting of some of the evidence of the defendant's atrocities adduced at trial.

A.  Rape and Sexual Slavery

- Witness N described being taken from her home by the defendant and forced to have sex with him every day for three weeks out of fear that he would kill her if she refused.  PSR ¶ 15.
- Witness L was thirteen years old when the defendant assigned her and the other women with whom she had been captured as sex slaves to his ULIMO fighters, ordering that they be killed if they resisted.  Witness L was raped by her assigned fighter the first day, and even though he injured her vagina during that rape, he continued to rape her until she escaped with the help of adult sex slaves, since she had difficulty walking owing to her injury. PSR ¶ 16.
- Witness E was captured by ULIMO-K fighters and imprisoned in Tubmanburg for several days, during which she was whipped and raped by ULIMO fighters under the defendant's command.  PSR ¶ 16.
- Witness S was captured as a boy and taken with other children and women to the defendant's base, where the women were kept as sex slaves in a hut they shared with the children.  PSR ¶ 25.
- Witness HH personally confronted the defendant after she learned that her father was dead after being ordered tied up by the defendant and left in the street to die because he complained to the defendant about his soldiers' treatment of her brother,

Witness O.  The defendant's response to her complaint was to order his fighters to take her away. The fighters took her to an unfinished building, where they raped her, during the course of which they bit, stabbed and fired a gun into the ground to force her to spread her legs, all of which left scars which she bears to this day. While hiding in the bush, Witness O heard his sister crying while she was raped. PSR ¶¶ 26, 27.

- Witness R testified that the defendant ordered his fighters to take away the wife of a fellow miner, and inferentially that the defendant subsequently raped her.  PSR ¶ 32.
- Witness T's pregnant fiancée was ordered to the defendant's house, where he beat Witness T and then raped his fiancée, who had a miscarriage two weeks later and died.  PSR ¶ 34.
- Witness K was eight months' pregnant when the defendant ordered her to be assigned as a sex slave to one of his fighters, who raped her, causing her to miscarry. PSR ¶ 35.

B. <u>Forced and Slave Labor</u>

- Witness H was forced to carry loads from Gbarquoitown to the defendant's Bopolu headquarters.  PSR ¶ 23.
- Witness EE and Witness DD saw ULIMO-K soldiers under the defendant's command force villagers from Dasalamu carry loot to his base.  PSR ¶¶ 28, 29.
- Witness R was enslaved as a miner by the defendant, who went to the mine almost daily to collect the miners' gold.  PSR ¶ 32.
- Witness Z was enslaved as a miner by the defendant, who collected the miners' diamonds.  PSR ¶ 33.
- Witness T was enslaved as a miner by the defendant, who collected the miners' diamonds.  PSR ¶ 34.
- Witness K was ordered by the defendant to carry ammunition to a ULIMO-K base and was beaten along the way by the armed guards.  PSR ¶ 35.

C. <u>Robbery and Looting</u>

- Witness N described the defendant entering a village and ordering its people tied up and beaten while he demanded their diamonds and food. Witness N specifically recalled an occasion when he ordered a woman who had come to trade diamonds stripped naked, beaten and robbed.  PSR ¶ 15.
- Witness O was robbed of food by fighters under the defendant's command.  PSR ¶ 26.
- Witness EE and Witness DD saw ULIMO-K soldiers under the defendant's command force the villagers of Dasalamu to carry the soldiers' looted belongings to his base. PSR ¶¶ 28, 29.

D. <u>Use of Child Soldiers</u>

- After he shot Witness E's sister Tina to death, the defendant ordered his men to

5

leave Tina's body there to rot, and ordered a child soldier to make sure no one touched the body.  PSR ¶ 17.

- Witness B saw a child soldier murder two NPFL POWs on the defendant's orders by burning and shooting them to death.  PSR ¶ 22.
- Witness V was guarded by armed child soldiers when he was tied up and marched towards Bopolu in a column of prisoners led by the defendant.  PSR ¶ 24.
- Witness R was enslaved as a miner by the defendant and guarded by armed child soldiers under the defendant's command.  PSR ¶ 32.
- Witness T was enslaved as a miner by the defendant and guarded by armed child soldiers under the defendant's command.  PSR ¶ 34.

E.  Mutilation

- Witness H testified about an occasion when a ULIMO truck carrying ammunition, RPGs and a large saw had run off a bridge and flipped into the river below.  The villagers were ordered to line up, and with the defendant watching while seated on top of his vehicle, they were lashed or had their arms slashed, which resulted in a scar Witness H still bears on his arm.  PSR ¶ 23.
- Witness V and his brother were captured, tied up in the duckfa tabed fashion, and marched towards Bopolu in a column led by the defendant.  When Witness V persistently complained, the defendant ordered Witness V to be brought to him, and ordered his fighters to kill Witness V.  After Witness V started to beg, the defendant ordered his ear cut off, so his fighters cut off his left ear.  PSR ¶ 24.

F.  Murder and Persecutory Killings

- Witness K saw the defendant order the murder of a prisoner, whose heart was later cut out.  PSR ¶ 16.
- After the ULIMO split, Witness E saw the defendant and other ULIMO fighters drag her sister Tina, who was naked from the waist up, outside into the street in Tubmanburg.  With Tina on the ground, the defendant demanded to know where T-Kahla, a Krahn commander, was.  When Tina replied that she did not know, the defendant took his pistol, shot Tina in the vagina, killing her.  Another woman had been shot as she tried to run out of Tina's house into a small alley, and her body was left face down hanging over a low wall with her feet up.  PSR ¶ 17.
- Witness B observed the defendant issue an order in Mandingo to a child soldier named Bullet Bounce to execute two NPFL prisoners of war.  Tires were placed around the prisoners' necks, and gas was poured into the tires.  The POWs were set on fire.  The fighters burned and shot the POWs to death.  Witness B was also present in 1994 after the split within ULIMO when a number of Krahn civilians, including four women, were captured, and the defendant and other ULIMO generals, including Pepper and Salt and Derko, discussed what to do with them.  After the discussion, the prisoners were tied up by their elbows in the duckfa tabed fashion, then began crying and begging for mercy while saying they were not fighters.  The prisoners did not appear to Witness B to be fighters, but were turned over to Derko, a ULIMO officer.  As Pepper and Salt and Witness B drove

6

away, Pepper and Salt told Witness B that the prisoners were Krahns that they had arrested and that they would get rid of them.  PSR ¶ 22.

- Witness H witnessed two Krahns who had refused to leave his village burned alive in a hole by ULIMO-K fighters.  PSR ¶ 23.

- Witness O's father took him to see the defendant after some of the defendant's soldiers robbed Witness O of some rice and slashed his arm with a bayonet.  When Witness O's father asked the defendant why his soldiers acted as they did and sought permission for medical treatment for his son, the defendant immediately ordered his fighters to strip Witness O's father naked, so he was stripped and bound in the duckfa tabed fashion and left in the street to die.  PSR ¶ 26.

- Witness EE, Witness DD and Witness AA saw ULIMO-K fighters under the defendant's command shoot a villager dead in their village of Dasalamu, where the fighters also shot and beat other villagers.  Witness EE and Witness DD testified that on a subsequent occasion, the defendant, accompanied by his sub-commanders and fighters, re-entered Dasalamu and shot at least three villagers to death, including the town chief.  PSR ¶¶ 28, 29, 30.

- Witness K saw the defendant order his ULIMO-K fighters to execute a civilian accused of being ULIMO-J; the man was tied to a tree and the defendant watched his fighters cut the man's throat.  PSR ¶ 35.

G. <u>Cannibalism</u>

- Witness L testified that the morning after she and others from her area were captured by the defendant's ULIMO fighters and taken to his Bopolu headquarters, a captive was brought out and the defendant ordered that his heart be cooked and fed to his fighters.  He told his fighters that if they did not eat the heart, they would die, so after they murdered him they took slices of the prisoner's heart and ate them.  PSR ¶ 16.

- While being held prisoner in Tubmanburg, Witness E saw ULIMO fighters, including the defendant, eating a human heart.  PSR ¶ 17.

- Witness H testified about human meat being consumed by ULIMO-K fighters under the defendant's command.

- Witness EE testified that fighters under the defendant's command murdered a villager, removed his heart and ordered the town chief's wife to cook it, telling her that they would do the same thing to her husband.  Witness BB, the town chief's widow, testified that she was forced to cook a heart from one of the villagers, and then forced to cook the heart of her husband.  PSR ¶¶ 28, 31.

Jabbateh concealed these facts, now proved, and prevented U.S. immigration officials from

discharging their vital gatekeeping duties as contemplated by our immigration system.

Nancy Vanlue was a U.S. asylum officer who interviewed the defendant on January 11,

1999, at which time she reviewed and confirmed with him the answers he provided on his Form

I-589 asylum application and related Personal Statement.  Based upon what the defendant swore to both in writing and after she placed him under oath, Vanlue understood that the defendant's role during the Liberian civil war from 1992 through 1995 was in the Special Security Service, or "SSS," the Liberian equivalent of the U.S. Secret Service, and that he was not a fighter.  The defendant said that he was known as "Jungle Jabbah," and also answered no to questions asking if he had ever committed a crime or harmed anyone else.  Vanlue believed the defendant and therefore recommended that he be granted asylum; however, if she had determined, or known at the time, that his answers were not truthful, she would not have done so.  Among the lies that Vanlue believed was that rather than being a combat commander during the war, the defendant spent 1992 through 1995 at the Executive Mansion in Monrovia as a member of the SSS.  That lie was disproved through several witnesses who knew the defendant during this period, worked daily in the Executive Mansion and knew the SSS and how it operated well enough to know that the defendant was never a member of that organization.  PSR ¶ 19.

Norman deMoose was a U.S. Customs and Immigration Services ("USCIS") adjudication officer who interviewed the defendant on March 11, 2011, at which time he reviewed and confirmed with him under oath the answers he provided on his form I-485 lawful permanent resident application.  DeMoose did not know very much about the Liberian conflict, other than that "no side had clean hands."  Question 8 asks, "Have you ever engaged in genocide, or otherwise ordered, incited, assisted or otherwise participated in the killing of any person because of race, religion, nationality, ethnic origin or political opinion?"  The defendant checked the box indicating "no," and when deMoose read that question word for word to the defendant, he verbally answered "no."  Question 10 asks, "Have you, by fraud or willful misrepresentation of a material fact, ever sought to procure, or procured, any immigration benefit?"  The defendant

checked the "no" box on the form, and when deMoose read that question verbatim to him during the interview, the defendant again answered "no."  While deMoose saw a copy of the defendant's ULIMO ID card in the A-File, the defendant never stated what he did while in ULIMO, and never indicated that he was a combatant, much less a battalion commander.  Had the defendant indicated that he had been a combatant or a commander, it would have made a difference to deMoose's decision concerning the defendant's application for a Green Card.  DeMoose testified that the honesty of an applicant is critical to the immigration process.  PSR ¶ 20.

## IV.     SENTENCING CALCULATION

### A.  Statutory Maximum Sentence.

The maximum sentence of imprisonment that may be imposed on the defendant upon conviction on Counts One and Two (18 U.S.C. § 1546(a), fraud in immigration documents) is ten years per count.  PSR ¶ 92.  The maximum sentence of imprisonment that may be imposed on the defendant upon conviction on Counts Three and Four (18 U.S.C. § 1621(1), perjury) is five years per count.  *Id*.

### B.  Sentencing Guidelines Calculation.

The Probation Office used the 2010 Guidelines Manual and correctly calculated the defendant's advisory guideline range as follows:  the Base Offense Level is 14, using the perjury guideline at U.S.S.G. § 2J1.3(a); with no other adjustments, the defendant's Total Offense Level remains at 14.[1]  PSR ¶¶ 42-53.  With a criminal history score of zero, the defendant's criminal

---

[1] The perjury guidelines provide an Accessory After the Fact cross reference if the offense involved perjury "in respect to a criminal offense."  Cases interpreting the "in respect to a criminal offense" language typically have arisen in the context of a grand jury investigation or other criminal proceeding involving a criminal offense, where the defendant knew or had reason to know that his testimony concerned such a criminal offense.  *United States v. Knight*, 700 F.3d

history category is I.  PSR ¶¶ 56-57.  Thus, based upon a Total Offense Level of 14 and a criminal history category of I, the resulting advisory guideline range is 15 to 21 months.  PSR ¶ 93.

### C.  The Role of the Defendant's Atrocities in the Court's Sentencing Determination

In considering the defendant's atrocities in determining whether to impose an upward departure pursuant to §§ 5K2.0 and 4A1.3 or an upward variance, the Court may consider those atrocities both independently of his convictions for fraud in immigration documents and perjury, as well as insofar as they increase the culpability of his immigration fraud and lies.  The Court may find the facts of these atrocities for sentencing purposes by a preponderance of the evidence, so long as they do not affect either the statutory minimum or maximum.  *Alleyne v. United States*, 133 S.Ct. 2151 (2013); *Apprendi v. New Jersey*, 530 U.S. 466 (2000).  It is a well-settled and "longstanding principle that sentencing courts have discretion to consider various kinds of information," *United States v. Watts*, 519 U.S. 148, 151 (1997), and a federal sentencing judge "has almost unlimited discretion in determining the appropriate sentence in a criminal case."

---

59, 64-65 (3d Cir.2012) (perjury during suppression hearing concerned a murder); *United States v. Leifson*, 568 F.3d 1215, 1220-23 (10th Cir.2009) (perjury before grand jury was in respect to a murder); *United States v. Flemmi*, 402 F.3d 79, 95-97 (1st Cir.2005) (perjury before grand jury was in respect to murder); *United States v. Suleiman*, 208 F.3d 32, 39 (2d Cir.2000) (perjury before grand jury was in respect to 1993 World Trade Center bombing); *United States v. Leon-Reyes*, 177 F.3d 816, 823-24 (9th Cir.1999) (perjury during trial related to money laundering charges, but not drug trafficking charges); *see also United States v. Blanton*, 281 F.3d 771, 775-76 (8th Cir.2002) (following *Leon-Reyes* and *Suleiman*, *supra*, and remanding for application of § 2J1.3(c) cross reference).  Thus, these cases all involved proceedings in connection with the investigation or prosecution of a criminal offense, and in which the defendant was placed on notice about said criminal offense and then lied about said criminal offense.  The facts of the instant case -- where the defendant perjured himself not during a criminal proceeding but during an immigration interview -- could arguably be viewed as distinguishable from these cases, although the "in respect to a criminal offense" language could also be read broadly to encompass the defendant's perjury during his adjustment of status interview to conceal his Liberian crimes. In any event, there is no reason to reach that issue here.

*United States v. Simmonds*, 235 F.3d 826. 837-38 (3d Cir.2000).  Indeed, "[n]o limitation shall

be placed on the information concerning the background, character, and conduct of the person

convicted of an offense which a court of the United States may receive and consider for the

purpose of imposing an appropriate sentence."  18 U.S.C. § 3661.  The Sentencing Guidelines

have adopted this principle as well, stating that "[i]n determining the sentence to impose within

the guideline range, or whether a departure from the Guidelines is warranted, the court may

consider, without limitation, any information concerning the background, character and conduct

of the defendant, unless otherwise prohibited by law."  U.S.S.G. § 1B1.4 (citing 18 U.S.C. §

3661).  Section 6A1.3 of the Guidelines instructs, with regard to the admissibility standard at a

sentencing hearing, that "the parties shall be given an adequate opportunity to present

information to the court regarding [any disputed] factor."  U.S.S.G. § 6A1.3(a).  "[T]he court

may consider relevant information without regard to its admissibility under the rules of evidence

applicable at trial, provided that the information has sufficient indicia of reliability to support the

probable accuracy."  *Id.*[2]  Given that "*any* information may be considered, so long as it has

sufficient indicia of reliability to support its probable accuracy," § 6A1.3(a), Comment.

(emphasis added), and given that the Third Circuit has consistently upheld a sentencing court's

reliance on testimony from another trial, the Court may certainly rely on the trial testimony of

the instant case over which it presided in finding facts by a preponderance of the evidence at

sentencing that were not explicitly or even necessarily found by the jury, so long as the parties

---

[2] In the commentary to Section 6A1.3, the Sentencing Commission notes several kinds of
information that are admissible at a sentencing hearing, including acquitted conduct (citing
*Watts*, 519 U.S. at 154); conduct that may be subject to subsequent prosecution (citing *Witte v.
United States*, 511 U.S. 738 (1995)); and reliable hearsay (citing *United States v. Petty*, 982 F.2d
1365 (9th Cir.1993) and *United States v. Sciarrino*, 884 F.2d 95 (3d Cir.1989)); U.S.S.G. §
6A1.3 Commentary.

are afforded fair notice and sufficient opportunity to review and respond to the specific evidence upon which the Court intends to rely and the purposes for which it intends to consider it.  *See United States v. Curran*, F. App'x 198, 201-02 (3d Cir.2013); *United States v. Dair*, 174 F. App'x 68, 70 (3d Cir.2006); *United States v. Reynoso*, 254 F.3d 467, 474 (3d Cir.2001).  *See also United States v. Knobloch*, 131 F.3d 366, 370 (3d Cir.1997) (holding that "[n]o rule of law prohibits the court from making its factual conclusions at sentencing based on testimony from a separate proceeding" (citing *United States v. Reyes*, 930 F.2d 310, 316 (3d Cir.1991)); *Simmonds*, 235 F.3d at 837-38 (sentencing court permitted to rely on codefendants' PSR information).

Thus, in order to obtain "the fullest information possible concerning the defendant's life and characteristics," the Court may consider evidence of the defendant's atrocities both independently of his fraud in immigration documents and perjury convictions, *and* insofar as that evidence increases the culpability of his fraud and perjury, as such evidence is precisely the type of "highly relevant – if not essential" information concerning the defendant's background, character and conduct upon which sentencing courts have historically been entitled to rely in their nearly unfettered discretion in fashioning a sentencing within the statutory maximum sentence, and to which courts traditionally have had almost unlimited access.  *Watts*, 519 U.S. at 151-52 (citing *Williams v. New York*, 337 U.S. 241, 247 (1949)).

### D.  An Upward Departure Is Warranted In This Extraordinary Case

The government seeks an upward departure to the statutory maximum of each count of conviction.  The specific offense characteristics contemplated by the Guidelines for the offenses of conviction do not capture the real offense conduct:  the defendant's deliberate pattern of prevarication to U.S. immigration authorities that spanned from 1998 through 2011, designed to

hide his wartime crimes.  The horrific nature of the human rights offenses that the defendant concealed in order to obtain asylum and subvert the immigration laws and process of the United States constitute grounds for an upward departure.  The persecutory facts of his military service were precisely those the defendant hid from the United States Citizenship and Immigration Services ("USCIS") gatekeepers when he applied for asylum and then lawful permanent resident status.  His atrocities in Liberia are therefore the necessary predicates to why and how he committed the offenses of conviction, and the two cannot be separated.  It is precisely his role in repeated atrocities that the defendant sought to conceal from the United States authorities when he lied, *inter alia*, on his sworn Forms I-589 and I-485 and under oath to asylum officer Vanlue and adjustment officer deMoose.

By providing a ten-year statutory maximum for a violation of 18 U.S.C. § 1546, Congress anticipated that there would be violations of that law so egregious that a sentence of a decade in prison would be appropriate. In the case of 18 U.S.C. § 1621, Congress likewise anticipated that there would be violations of law so egregious that a sentence of one-half decade in prison would be appropriate.  There can be no more serious basis for immigration fraud than a perpetrator's concealment of and lying about his prior participation in rape, sexual slavery, forced and slave labor, murder, mutilation and ritual cannibalism.

Other courts sentencing offenders who participated in human rights violations in their home country and lied about that conduct during the immigration process have departed upwards to the statutory maximum.  *See United States v. Munyenyezi*, 781 F.3d 532 (1st Cir.2015) (affirming ten-year statutory maximum sentence where the defendant's Guidelines range was zero to six months); *United States v. Jorge Sosa*, 608 F. App'x 464 (11th Cir.2015) (affirming ten-year statutory maximum sentence for naturalization fraud conviction for defendant who

participated in a single mass atrocity in Guatemala, where the defendant's Guidelines range was

six to twelve months); *United States v. Horton*, 497 F. App'x 302 (4th Cir.2012) (affirming ten-

year statutory maximum sentence for passport fraud conviction where defendant kidnapped his

daughter, whom he sexually abused after taking her overseas; defendant's Guidelines range was

24 to 36 months' imprisonment); *United States v. Gilberto Jordan*, 432 F. App'x 950 (11th

Cir.2011) (affirming ten-year statutory maximum sentence for naturalization fraud conviction for

defendant who participated in a single mass atrocity in Guatemala, where defendant's Guidelines

range was zero to six months' imprisonment and court granted an upward 5K2.0 departure).

### 1. Section 5K2.0(A) Departure

The human rights violations in which the defendant participated and which he concealed

in order to obtain asylum and continued to conceal throughout his lawful permanent residence

adjustment process constitutes grounds for an upward departure under the Guidelines, as it is "an

aggravating or mitigating circumstance . . . of a kind, or to a degree, not adequately taken into

consideration by the Sentencing Commission in formulating the Guidelines that, in order to

advance the objectives set forth in 18 U.S.S. § 3553(a)(2), should result in a sentence different

from that described."  U.S.S.G. § 5K2.0(a)(1)(A).

An upward departure is warranted in this case because it is well outside the heartland of

the applicable guidelines.  Following the Third Circuit's three-part process, the factor that takes

the case outside the Guidelines' heartland and makes it unusual is the egregious nature of the

defendant's war crimes which were the *sine qua non* of his subsequent fraudulent and perjurious

statements to U.S. immigration authorities.  *United States v. King*, 604 F.3 125, 142 (3d

Cir.2010).  The Guidelines neither forbid nor encourage departures based on this factor, and as of

2012, mention that factor only in connection with U.S.S.G. § 2L2.2.  As noted *infra* in footnote

3, this factor is sufficient to take the defendant's case outside the heartland under both the 2010 and post-2012 Guidelines. The difference cannot be overstated between, for example, the garden-variety conduct of an offender who lies about overstaying a visa or his marital status in attempting to obtain U.S. citizenship or remain in this country to escape poverty, and the instant case, where the defendant concealed and lied about an extensive history of human rights abuses. A case with anything remotely resembling these particular facts is virtually unprecedented.[3]

## 2. Departure Under Section 5K2.1 through Section 5K2.9

Section 5K2.0 by itself supports the requested departure, which is also justified by numerous particular guidelines in Chapter 5K2. Among the examples listed in the Guidelines for departing upward are Death (§ 5K2.1), Physical Injury (§ 5K2.2), Extreme Psychological Injury

---

[3] The fact that the 2012 amendments to U.S.S.G. § 2L2.2 add a specific offense characteristic where a defendant committed an immigration fraud offense to conceal his participation in a serious human rights offense, does not establish that the Guidelines adequately take into account the defendant's conduct. A "serious human rights offense" is defined under the 2012 amendment as "(A) violations of federal criminal laws relating to genocide, torture, war crimes . . . and (B) conduct that would have been a violation of any such law if the offense had occurred within the jurisdiction of the United States or if the defendant or the victim had been a national of the United States." U.S.S.G. § 2L2.2 Application Note 4. Serious human rights offenses can be committed in a variety of ways, including assault, kidnapping and murder. U.S.S.G. Supplement to Appendix C, p.14. Even in light of these revisions, the atrocities the defendant concealed and about which he lied are of a kind and to a degree not contemplated by the Sentencing Commission. *Cf. Munyenyezi*, 781 F.3d at 543-44 (where sentencing court considered the revisions to § 2L2.2, but concluded that "the 'facts' that made her immigration/naturalization 'statements lies' – *i.e.*, the facts that showed her to be a génocidaire – are so 'disturbing' that she deserved the maximum sentence permitted by statute"). However, following the rule of lenity and *Peugh v. United States*, 133 S.Ct. 2072 (2013), the government agreed with the Probation Office's use of the 2010 Guidelines, and the government's position remains that the 2010 Guidelines should apply. PSR ¶ ¶ 42 n.3 and 108 n.17; U.S.S.G. § 1B1.11(b)(1). There is no *ex post facto* issue in this case because the 2010 guideline should apply, and the government is not seeking application of the enhancement provided in the 2012 amendment. *United States v. Larkin*, 629 F.3d 177, 194 (3d Cir.2010). Rather, the government is seeking a departure from the 2010 Guideline range, and in that regard, the adoption of the 2012 amendment simply underscores how the defendant's conduct was not fully addressed by, and fell far outside the heartland of, the 2010 range.

(§ 5K2.3), Abduction or Unlawful Restraint (§ 5K2.4), Property Damage or Loss (§ 5K2.5), Use of Weapons and Dangerous Instrumentalities (§ 5K2.6), Disruption of Governmental Function (§ 5K2.7), Extreme Conduct (§ 5K2.8) and Criminal Purpose (§ 5K2.9).[4]  All of these are arguably applicable in this case, though the government recognizes that they would typically apply to victims of the offenses of conviction or to the intrinsic conduct of the offenses of conviction.

     a.  Sections 5K2.1, 5K2.2, 5K2.4, 5K2.5 and 5K2.6

As summarized *supra*, the defendant participated in or oversaw summary murders, mutilations, rapes, sexual enslavement, forced and slave labor, robbery, looting and cannibalism. The defendant and fighters acting on his orders or under his command committed many of these crimes in an extraordinarily cruel, heinous and degrading manner.  Thus, §§ 5K2.1 (Death), 5K2.2 (Physical Injury), 5K2.4 (Abduction or Unlawful Restraint) and 5K2.6 (Weapons and Dangerous Instrumentalities) are all applicable to the defendant's wartime conduct, during which he committed and ordered horrific intentional murders (*e.g.*, shooting a pregnant woman in the vagina and ordering the execution of prisoners by slitting their throats and burning them alive), caused severe and sometimes permanent physical injuries (*e.g.*, from beatings, maimings, mutilations and rapes) and ordered painful unlawful restraint and forced marches (oftentimes carrying their own looted possessions to the defendant's base), and the capture, kidnapping and enslavement of civilians.

---

[4] The related provision of U.S.S.G. § 5K2.21 also could be applied to depart upward, but may be cumulative of 5K2.0 in this case.  That section provides that a court may depart upward to "reflect the actual seriousness of the offense based on conduct (1) . . . underlying a potential charge not pursued in the case . . . for any other reason; and (2) that did not enter into the determination of the applicable guideline range.  The commission of the litany of atrocities set forth above constitutes uncharged conduct that did not enter into the determination of the applicable Guidelines range, but should be considered to reflect the seriousness of the offense.

b.   <u>Sections 5K2.3 and 5K2.8</u>

Some of the defendant's crimes were extreme both in their psychological injury and in their conduct, and therefore warrant upward departures under §§ 5K2.3 (Extreme Psychological Injury) and §§ 5K2.8 (Extreme Conduct).  For example, the limits of psychological endurance were doubtlessly reached by Witness BB, who was forced to cook her husband's heart after he was murdered, all on the defendant's orders.  The debilitating emotional trauma Witness BB continues to suffer more than 20 years after her husband's murder was evident during her trial testimony, which was interrupted when she broke down and had to leave the stand.  Witnesses AA, DD and EE, who were also present on the night Witness BB's husband -- their leader and, in the cases of Witnesses AA and DD, their brother -- was murdered and cannibalized, also broke down and were visibly emotional and traumatized during their testimony.

The continuing traumatic consequences of the defendant's extreme conduct were also manifest during the testimony of Witness E, who broke down when recalling her sister Tina, who Witness E saw shot in the vagina by the defendant.  Witness E, like Witness BB, had to leave the stand to compose herself after breaking down.

c.   <u>Section 5K2.7</u>

As the government argues more fully below, the defendant's false statements and perjury also significantly disrupted a governmental function, thus warranting an upward departure under U.S.S.G. § 5K2.7.  Indeed, the U.S. laws and immigration scheme under which the defendant fraudulently and deceitfully sought refuge and asylum were the very laws designed to keep a human rights abuser such as him from obtaining safe haven in this country.  The depth of the depravity of the defendant's abominable crimes in Liberia -- which he deliberately and repeatedly concealed in order fraudulently to obtain immigration benefits -- only intensifies the

degree to which the defendant perverted our immigration laws.  In the eyes of his neighbors and members of his diaspora community in the Eastern District of Pennsylvania, some of whom are no doubt members of the ethnic groups he victimized, the integrity and efficacy of our system of immigration laws risked being severely vitiated by his two decades of living here with impunity and enjoying all of the freedoms and comfort granted by our nation.  No less in the eyes of the world, the place of the United States as a beacon to the world's persecuted risked being dimmed when our laws were so flagrantly abused and thwarted by the defendant.

     d.  Section 5K2.9

In addition, U.S.S.G. § 5K2.9 is applicable to the defendant's conduct, as he swore to and submitted false immigration documents and then perjured himself in connection with them in order to conceal his involvement in another offense; here, gross human rights abuses.

**3.  Section 4A1.3 Departure**

The government also seeks an upward departure pursuant to Guidelines Section 4A1.3 because the defendant's conduct during the first Liberian civil war constituted criminal activity, the seriousness of which is wholly unrepresented by his criminal history.  U.S.S.G. § 4A1.3(a)(1).  Section 4A1.3 provides that "[i]f reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, an upward departure may be warranted."  *Id.*  Here, the PSR calculated a criminal history score of zero and a corresponding criminal history category of I because he has never been charged with, much less convicted of a crime, despite having committed numerous heinous war crimes.  PSR ¶¶ 56-57.  That this is so is unsurprising given the repeated testimony of witnesses who consistently described the virtually nonexistent legal system in Liberia during and in the aftermath of its

bloody and catastrophically destructive wars.

In imposing an upward departure under Section 4A1.3, on the grounds that the defendant's criminal history category significantly underrepresented his actual history, it is required that the district court "ratchet" and consider each higher criminal history category sequentially, determining why each is inadequate before proceeding to the next. *United States v. Freeman*, 316 F.3d 386, 391 (3d Cir.2003).[5]  However, the Court need not follow a "ritualistic exercise in which it mechanically discusses each criminal history category it rejects en route to the category it selects," but will comply with the ratcheting procedure if its "reasons for rejecting each lesser category [are] clear from the record as a whole."  *United States v. Harris*, 44 F.3d 1206, 1212 (3d Cir.1995) (citation and quotations omitted).

Section 4A1.3 allows courts to impose upward departures if "reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(a)(1).  Courts have permitted upward departures to account for criminal conduct for which the defendant has never been arrested. *See United States v. Green*, 516 F. App'x 113, 133-34 (3d Cir.2013) (sentencing court's upward departure properly based on reliable evidence that defendant "had engaged in numerous episodes of uncharged" crimes).  A sentencing court may also consider as relevant conduct, crimes which could not be independently prosecuted because of the passage of time or that are beyond the jurisdiction of the court.  *See United States v. Amirault*, 224 F.3d 9, 15 (1st Cir.2000) (citations omitted); and *United States v. Pollard*, 986 F.2d 44, 47 (3d Cir.1993).  While, moreover, a § 4A1.3(a)(1) departure can be

---

[5] The court need not follow this procedure when imposing a variance.  *United States v. Colon*, 474 F.3d 95, 99-100 (3d Cir. 2007).

19

based upon dissimilar conduct that was neither charged nor the subject of a conviction, in this case, the un-represented criminal conduct was the very information that made the defendant ineligible for asylum and about which he lied and committed perjury during the adjustment process.

In this case the defendant's true criminality should be reflected in a commensurate Guidelines criminal history category and offense level.  Section 4A1.3(a)(1) of the Guidelines affords this Court the discretion to do just that by departing both horizontally across the sentencing table by increasing his criminal history, and vertically, by increasing the offense level.  In light of the defendant's heinous proven uncharged criminal conduct, it is difficult to envision a circumstance under which a defendant's criminal history category more substantially and grotesquely underrepresents the seriousness his criminal history than in this case.  The numerous atrocities for which the defendant is responsible strongly militate in favor of him falling within criminal history category VI.  Additionally, his almost unfathomable conduct, including his direct responsibility for several murders, strongly favor an upward departure from criminal history category VI to an appropriate offense level of 43, using the First Degree Murder Guideline. *See* U.S.S.G. § 4A1.3(a)(4), § 2A1.1.  The government respectfully urges this Court to exercise its discretion by granting the government's motion for an upward departure, raising the defendant's criminal history category and offense level commensurate with the defendant's vast destructive criminal conduct.

V.      **SECTION 3553(a) ANALYSIS**

A thorough consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) establishes that the most appropriate sentence is one far above the advisory Guideline range of fifteen to twenty-one months.  A sentence within the advisory Guideline range would be

grotesquely inadequate in this case when considered in light of the 3553(a) factors.  First, the highest sentence available is necessary here to reflect the seriousness of the defendant's crime, to promote respect for the law, and to afford an adequate deterrent to similar criminal conduct. Those involved in egregious human rights violations on distant shores must be meaningfully deterred in their attempts to obtain U.S. immigration benefits by fraud and deceit.  A sentence within the Guidelines range would be wholly inadequate to provide such deterrence.

The government therefore seeks an upward variance to four consecutive statutory maximum sentences of imprisonment per count of conviction, for a total of thirty years, based upon the sentencing factors set forth in 18 U.S.C. § 3553(a).

The Supreme Court has declared:  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).  "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range."  *Peugh v. United States*, 133 S. Ct. 2072, 2083 (2013) (quoting *Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011) (plurality opinion); ellipsis in original).  "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences."  *Peugh*, 133 S. Ct. at 2084.  "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing."  *Id.*

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a).  Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public

from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).

### A.  <u>Consideration of the 3553(a) Factors.</u>

#### 1.  **The Nature, Circumstances and Seriousness of the Offense.**

Unlike many defendants who lie in order to travel to or remain in the United States to, for example, escape poverty, the defendant's lies in this case were carefully calculated to deceive the U.S. immigration authorities by misdirecting them from and concealing his egregious wartime atrocities.  Here, the defendant engaged in a serious offense by repeatedly lying and then perjuring himself throughout the immigration process with a cover story that portrayed him as a blameless victim of persecution and peacemaker who had done nothing during the war except serve as a linguist and security officer in the Executive Mansion.

The United States grants asylum to many people with well-founded fears of persecution in their home countries, but there is a limit to the number of immigrants and refugees we can take in, in this country.  The defendant's fraud and deceit to obtain asylum and seek an adjustment of status impaired the integrity of the critical process the United States government has in place to determine who really deserves refuge in this country, and who does not.  By absorbing resources that could have been used to hear and decide other cases, the defendant's offense conduct made it more difficult for people with legitimate claims to obtain refuge here. That a persecutor like the defendant could walk freely among his expatriate countrymen, some

22

no doubt belonging to the very groups he persecuted, made a mockery of our system of laws and risked breeding cynicism about its efficacy.

### 2. The History and Characteristics of the Defendant.

The defendant's history supports the need for significant incarceration. He was a battalion commander who rose quickly through ULIMO's ranks, no doubt in large part owing to his ruthless, iron rule over the territory he controlled. That he was promoted to Lieutenant General by the ULIMO's leader Alhaji Kromah, speaks not to any virtue as a peacemaker, but to his recognized record as a merciless warfighter.

During his 1999 asylum interview, a forum in which there was limited ability, aside from asking questions of the defendant, to elicit facts about events that occurred across the world, the defendant was able shrewdly to dictate the terms by which his asylum application could be judged. The defendant's lies throughout his immigration proceedings obstructed them and thwarted the process to determine whether he should be granted the benefits for which he applied. Moreover, the defendant aggravated that crime by lying under oath to Officer deMoose and committing perjury. Over the course of these proceedings, the defendant's fraud and deceit persisted, and remained deliberate.

Furthermore, just as witnesses testified that he remained unmoved by pleas for mercy, the defendant has shown not one shred of remorse during entirety of the proceedings. There has been no acceptance of responsibility, contrition or flicker of empathy, even in the face of the victim witnesses' gut-wrenching testimony and the jury's verdict.

### 3. The Need to Promote Respect for the Law.

The essential mission of our U.S. immigration officers is to ensure that people who do not belong in the country are prevented from entering it. That was the function the defendant

corrupted.  Migrants and refugees arrive on our shores for myriad reasons, some fleeing the persecution or the horror of war, others the desperation of extreme privation.  All come here knowing that our country is one that is governed by laws, and they must see that those laws work and that human rights violators will not find safe haven here.  Moreover, they must expect that serious consequences will flow should they enter or seek to remain through fraud and deceit, and that those consequences will be particularly severe if they seek to conceal their participation in human rights abuses.

### 4.  The Need to Provide Just Punishment for the Offense.

Anything less than the maximum available term of imprisonment would be grotesquely inadequate as just punishment for the defendant's crimes and their underlying heinous acts.

### 5.  The Need to Deter Others from Committing Similar Criminal Conduct.

The United States has a vital public interest in deterring human rights violators from seeking to gain entry, refuge and safe haven in this country.  Deterrence requires that the sentence send a signal to others similarly situated in order to create a disincentive to manipulate the U.S. immigration system.  As efforts increase around the globe to end the culture of impunity and to investigate, prosecute and hold accountable human rights abusers, there will necessarily be an increased temptation on the part of those abusers to seek safe haven in the United States.  Our immigration system provides an abuser who seeks admission to the United States a simple choice:  tell the truth and risk exclusion, or lie and risk prosecution.  The defendant's sentence must offer a third and equally simple alternative as a powerful disincentive to human rights abusers tempted to try their hand at manipulating the generosity inherent in our system of immigration laws:  do not even try it, because if you do, you do so at the grave risk of losing your liberty for a significant period of time.

6. **The Need to Protect the Public from the Defendant and Deter Him from Committing Similar Criminal Conduct.**

A sentence above the advisory guidelines range is necessary to protect the public from the defendant and deter him from committing similar crimes in the future.  The jury found and the Court may similarly find by a preponderance of the evidence that the defendant committed numerous and myriad acts of depravity and brutality.  His past conduct demonstrates the brutality of which the defendant is capable, and which he has successfully concealed from his employees, neighbors, community, his current wife and, until recently, the government.  The mere fact that the defendant has lived a "law-abiding life" quietly among the citizens of the Eastern District of Pennsylvania ought not to be rewarded, nor presumed to be evidence that the passage of time alone has rendered him nonviolent.

7. **The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct.**

As noted above the evidentiary foundation for defendant's crimes is largely unprecedented. Thus it is difficult to compare the defendant's conduct with others because there is a dearth of defendants who are truly similarly situated. In that there are human rights violators who have been sentenced for making misrepresentations in the U.S. immigration process they, as noted above, were largely sentenced to terms of imprisonment far in excess of the terms provided by applicable sentencing guideline ranges. Thus, in this case the sought variance would not cause an unwarranted sentencing disparity.

8. **The Need to Provide the Defendant with Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner; and Restitution.**

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in

the most effective manner . . . ."  § 3553(a)(2)(D).  Also, restitution is not an issue in this case.

§ 3553(a)(7).

    **B.  <u>An Upward Variance Is Warranted In This Extraordinary Case.</u>**

       The government seeks an upward variance to the statutory maximum penalties, per count,

to run consecutively, for a total of thirty years' imprisonment.  As noted above, courts are

required to "impose a sentence sufficient, but not greater than necessary" to accomplish the

purposes of sentencing as articulated in 18 U.S.C. § 3553(a). A sufficient sentence must "reflect

the seriousness of the offense," "promote respect for the law," "afford adequate deterrence to

criminal conduct," and "protect the public from further crimes of the defendant." § 3553(a)(2).

Courts are to consider these factors based "on the specific circumstances of the case and the

defendant." *United States v. Melvin*, 2009 WL 3128358, at *6 (D.N.J. Sept. 25, 2009). Under

circumstances in which the applicable Sentencing Guidelines range is "inadequate to impose a

sentence that is 'sufficient, but not greater than necessary' to accomplish the goals of

sentencing," courts have gone "outside the guideline range…to justly meet the criteria of §

3553(a)." *Id.*, *quoting* § 3553(a). In determining whether an upward variance is appropriate

courts can properly consider a combination of factors. *See United States v. Varsanyi*, 392 F.

App'x 15, 17 (3d Cir. 2010).  These factors include, but are not limited to, whether the defendant

has a criminal history category that understates his past. *See United States v. Passalaqua*, 508 F.

App'x 141, 143 (3d Cir. 2013).

       The above review of relevant 18 U.S.C. §3553(a) factors within the context of the

defendant's conduct, either singularly or collectively, militate in favor of an upward variance.

As noted above, the offenses of conviction are extremely serious, as they involve the defendant's

concealment of years of brutal atrocities and the subversion of the United States' immigration

system.  *See United States v. Jorge Sosa*, 608 F. App'x 464, 468 (9th Cir.2015) (upholding

sentence of 120 months' imprisonment where the guidelines sentence was six to twelve months,

and where the crimes the defendant "lied about on his naturalization application were

exceptionally heinous, making the circumstances of his offense distinct from most [naturalization

fraud] prosecutions."); *United States v. Worku*, 800 F.3d 1195, 1207-08 (10th Cir.2015)

(upholding 22-year sentence where court varied upwards to statutory maximum on each count, to

run consecutively in immigration fraud and identity theft case where evidence concealed his

torture and murder of prisoners in Ethiopia).

A thirty-year sentence is required to achieve just punishment and to deter other

persecutors from finding sanctuary in the United States.  Here, unlike some other human rights

violators who were lower-level figures when they participated in single mass atrocities, the

defendant was the highest-level commander in the areas over which he had control.  *See*, *e.g.*,

*United States v. Boskic*, 545 F.3d 69 (1st Cir.2008) (lower-level shooter who participated in part

of a larger massacre) and *Jordan*, *supra* (same).  The defendant is precisely the type of person

that the U.S. immigration system is designed to keep out.

Asylum is a privilege reserved for the sincere victims of persecution in the world.  The

defendant exploited that benefit by concealing his past that would have raised questions about

whether he, in fact, was a persecutor himself.  A less severe sentence would send the opposite

message about the gravity of his type of crimes, as well as about the gravity of committing

perjury and false documents when claiming asylum.  While the core of the harm here is the fraud

upon the United States' immigration process, what the defendant lied about is an aggravating

factor which cannot be ignored.

By concealing the true nature of his military past and gaining asylum, each day of the

27

nearly twenty years he spent living among the law-abiding in this country was an ongoing illicit benefit he obtained by fraud and deceit.

To be clear, the government is not asking the Court to sentence the defendant to thirty years' imprisonment for being a war criminal (though the evidence at trial in fact firmly established that he is one), but because his lies were the most egregious violations of the offenses of conviction conceivable.  The defendant lied to obtain asylum for which he was not qualified, and lied throughout the subsequent immigration process when asked on immigration forms and in person by U.S. immigration officers about causing harm, persecuting and committing crimes, knowing full well that an honest answer to any of those questions would have placed his applications in jeopardy.  By employing fraud and deceit, the defendant seriously undermined the integrity of the United States' immigration regime in the most invidious way: by wearing the duplicitous mask of an asylee over the face of a brutal persecutor.

**WHEREFORE**, the government respectfully requests that its motion for an upward departure be granted, and that in order to effectuate the goals of sentencing as articulated in 18 U.S.C. § 3553(a), the Court vary upwards from the otherwise applicable Sentencing Guidelines range.

Respectfully submitted,

LOUIS D. LAPPEN
United States Attorney


*/s/Linwood C. Wright, Jr.*
LINWOOD C. WRIGHT, JR.
NELSON S.T. THAYER, JR.
Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Memorandum In Support Of Government's Amended

Motion For Upward Departure and/or Variance and Amended Sentencing Memorandum was

filed electronically on the Electronic Case Filing system, is available for viewing and

downloading from the ECF system, and/or was served on defense counsel as follows:

Gregory J. Pagano, Esquire
Gregory J. Pagano, P.C.
1315 Walnut Street, Floor 12
Philadelphia, PA 19107
(215) 636-0160
Fax: (215) 636-0164
gpagano@paganolaw.net


*/s/Linwood C. Wright, Jr.*
LINWOOD C. WRIGHT, JR.
NELSON S.T. THAYER, JR.
Assistant United States Attorneys


Date:  February 14, 2018