IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| : | |
| v. : | **Crim. No. 16-88** |
| : | |
| **MOHAMMED JABBATEH** : | |

## O R D E R

After a ten day trial, the jury found Defendant Mohammed Jabbateh guilty of two counts of fraud in immigration documents and two counts of perjury. (Verdict Sheet, Doc. No. 104); 18 U.S.C. §§ 1546(a), 1621(l).  The evidence showed that, in seeking United States permanent residency status, Defendant falsely denied that he committed innumerable acts of violence and genocide during the Liberian Civil War.  Sentencing is scheduled for April 19, 2018. (Doc. No. 113.)

A large number of Defendant's supporters attended his Pretrial Detention and Arraignment Hearings, overfilling the courtrooms.  (Doc. No. 9.)  Trial counsel and the United States Marshals Service informed me of their security concerns, given the acrimony between Defendant's supporters and the Government's victim-witnesses.  Foremost was the fear of violence and disorder in the Courtroom.  (See Order, Doc. No. 79.)  On September 25, 2017, I held a hearing on security.  (Doc. No. 78.)  The next day, I ordered several measures to ensure the trial was safe and orderly.  (Doc. No. 79.)  As anticipated, my Courtroom was filled to capacity on each day of trial.  Toward the end of trial, Defendant's supporters demonstrated outside of the Courthouse and filled the hallways outside the Courtroom in prayer.

The sentencing hearing will present many of the same security concerns.  In addition, although Defendant's advisory Guidelines range is only fifteen-to-twenty-one months' imprisonment, the Government has urged that I upwardly vary and depart and impose a statutory

maximum sentence of thirty years' imprisonment. Probation also recommends a considerable upward departure to ten years' imprisonment. I have ordered the Parties to submit memoranda on the propriety of any upward variance or departure, and expect to hear argument on these points. I am concerned that these arguments may cause rancor among any of Defendant's supporters or detractors who may be in the Courtroom. Accordingly, I will order some of the same security measures to ensure that the proceedings are safe and orderly. The Parties do not object to these measures.

I am cognizant of the Defendant's Sixth Amendment right to a public trial and the public's First Amendment and common law rights of access to criminal proceedings. See, e.g. Press-Enter Co. v. Sup. Ct. of Calif. for Riverside Cty., 478 U.S. 1, 8 (1986); United States v. Lnu, 575 F.3d 298, 305 (3d Cir. 2009); United States v. Wecht, 484 F.3d 194, 207–08 (3d Cir. 2007); see also United States v. Rivera, 682 F.3d 1223, 1228 (9th Cir. 2012) (right to public trial extends to sentencing); United States v. DeLaRosa, 127 F. App'x 523, 523–24 (2d Cir. 2005). Nonetheless, the "right to a public trial is not absolute; it 'may give way in certain cases to other rights or interests'" in appropriate circumstances. Lnu, 575 F.3d at 305 (quoting Waller v. Georgia, 467 U.S. 39, 45 (1984)).

To ensure access to media, counsel, agents, support staff, and Court personnel, the courtroom seating will be arranged as follows: the front row is reserved for the United States Marshals Service (in accordance with customary policy), attorneys, agents, support staff, and Court personnel; the second row is reserved for members of the media; and the third, fourth, and fifth rows are reserved for members of the public. Once the seats in the Courtroom are filled, spectators will be directed to a satellite courtroom with an audio broadcast of the proceedings.

I will bar spectators from bringing electronic devices into the courtroom. Before entering

the courtroom, members of the public will undergo a magnetometer scan for electronic devices.

These measures will not apply to: members of the media; all counsel, and counsels' employees and agents; law enforcement personnel; and Court and security personnel.

These "reasonable limitations on access" do not amount to a closure of the courtroom that implicates the First Amendment, Sixth Amendment, or common law right to a public trial. Press-Enterprise Co. v. Sup. Ct. of Calif., Riverside Cty, 464 U.S. 501, 511 n.10 (1984); see Lnu, 575 F.3d at 306 (court's failure to broadcast simultaneously to spectators audio recordings introduced into evidence did not implicate the right to public trial because "any member of the public desiring to attend [defendant's] trial had the opportunity to do so" and restriction did not impermissibly limit the public's opportunity to report what it had observed). Indeed, I will reserve seating for the media and the public, and permit the media to retain electronic devices, thus allowing accurate and timely reporting of the proceedings.

In the alternative, balancing the need for public access against the need for security, I also conclude that these restrictions do not run afoul of the First Amendment, Sixth Amendment, or the common law rights of access. See Waller v. Georgia, 467 U.S. 39, 48 (1984) (to close a courtroom under the Sixth Amendment: "(1) the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, (2) the closure must be no broader than necessary to protect that interest, (3) the trial court must consider reasonable alternatives to closing the proceeding, and (4) it must make findings adequate to support the closure."); see also id. at 46 ("[T]he explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public."); In re Cendant Corp., 260 F.3d 183, 194 (3d Cir. 2001) (where common law right of access attaches, it "must be balanced against the factors militating against access").

3

First, the need to preclude courtroom disorder and violence is an overriding interest warranting some restriction on courtroom access. Tucker v. Superintendent Graterford SCI, 677 F. App'x 768, 777 (3d Cir. 2017) (unpublished) (citing Codispoti v. Pennsylvania, 418 U.S. 506 (1974)); see also United States v. Smith, 426 F.3d 567, 573 (2d Cir. 2005) ("[T]he district court's 'common sense' conclusion that '[s]omeone who is forced to identify themselves is less likely to pose a threat than someone who is allowed to walk into the building without any at all'" warranted partial closure of proceedings.); cf. United States v. Kobli, 172 F.2d 919, 922 (3d Cir. 1949) ("[T]hose spectators who are admitted must observe proper decorum and if their conduct tends in any way to interfere with the administration of justice in the courtroom they may, of course, be removed."). Moreover, ensuring press access to court proceedings is one of the primary goals of the First Amendment. See Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 573 (1980) ("While media representatives enjoy the same right of access as the public, they often are provided special seating and priority of entry so that they may report what people in attendance have seen and heard. This 'contribute[s] to public understanding of the rule of law and to comprehension of the functioning of the entire criminal justice system . . . .'" (quoting Nebraska Press Ass'n v. Stuart, 427 U.S. 539 (1976))). Second, these restrictions are no broader than necessary: I am merely organizing Courtroom seating, limiting the use of electronic devices, and precluding Courtroom access to those for whom a seat is no longer available. These are modest restrictions that are especially necessary to prevent disruptions and ensure Courtroom safety. Moreover, because a large number of Defendant's supporters are expected to attend the sentencing, reserved seating for the media, counsel, agents, support staff, Marshals, and Court personnel is necessary. Third, there are no less burdensome mechanisms to promote courtroom security and ensure the presence of media representatives as well as the others seated in the first

two rows.  Moreover, a satellite courtroom will be available to the public.  Finally, the turnout of Defendant's supporters at trial and prior hearings is sufficient to warrant these restrictions.  I am certainly prepared to adjust any of these measures should that be appropriate.

**AND NOW**, this 8th day of March, 2018, it is hereby **ORDERED** that during the sentencing hearing of Defendant Mohammed Jabbateh:

1. The **UNITED STATES MARSHALS SERVICE** shall **RESERVE** the first row of gallery seating in Courtroom 14A of the James A. Byrne United States Courthouse for themselves, counsel and their agents, support staff, and Court personnel; the second row of gallery seating for the media; and the third, fourth, and fifth rows of gallery seating for members of the public;

2. There shall be a satellite courtroom set up with an audio broadcast of the proceedings;

3. Spectators may not bring electronic devices into the courtroom.  The **UNITED STATES MARSHALS SERVICE** shall **SCAN** spectators with a magnetometer to prevent them from bringing electronic devices into the courtroom.  These measures will not apply to:  members of the media; all counsel, and counsels' employees and agents; law enforcement personnel; and Court and security personnel; and

4. These measures shall be implemented on an as-needed basis as determined by the United States Marshals Service and the Court.

**AND IT IS SO ORDERED.**

*/s/ Paul S. Diamond*
_____
Paul S. Diamond, J.

5